<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**
_____
FRANK L. MARSH, Jr.,                            :
                                                :
              Petitioner,                       :        Civil Action Number 19-15440 (GC)
                                                :
       v.                                       :
                                                :
ATTORNEY GENERAL OF THE STATE   :        **OPINION**
OF NEW JERSEY, et al.,                          :
                                                :
              Respondents.                      :
_____:

<u>**CASTNER, District Judge**</u>

## I.     INTRODUCTION

Petitioner, Frank L. Marsh, Jr. ("Petitioner" or "Marsh"), is a state prisoner proceeding through counsel with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. (*See* ECF 1). Previously, this matter was administratively terminated subject to reopening due to a lack of a complete state court record filed by Respondents, most notably the lack of a transcript of the prosecutor's summation. (*See* ECF 23). Respondents have now supplied this Court with a copy of that transcript (*see* ECF 24) such that the Clerk will be ordered to reopen this case so that it can be decided.

For the following reasons, Petitioner's habeas petition is denied. A certificate of appealability shall issue on certain claims.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

Petitioner's state court criminal convictions derive from the murder of Vincent Russo. A jury found Petitioner guilty of first-degree murder for hire, possession of a weapon for an unlawful purpose and unlawful possession of a weapon. Petitioner's co-defendant, Raymond Troxell, was

tried separately from Petitioner and found guilty of the first-degree murder of Russo. The State's theory of the case was that Petitioner killed Russo at approximately 7:00 p.m. on December 15, 2008, at a delicatessen owned by Russo and Troxell. (*See* ECF 11 at 19). The specific factual background related to Petitioner's state criminal convictions comes from the New Jersey Superior Court, Appellate Division opinion on Petitioner's direct appeal. The Appellate Division outlined the facts surrounding Petitioner's convictions as follows:

> In the summer of 2008, Troxell and Russo opened Mezzaluna, an Italian deli in North Brunswick. Troxell and Russo often argued regarding business finances, and tensions steadily mounted over time.
>
> On December 16, 2008, at approximately 6:30 a.m., North Brunswick Township police officer Robert Frangella was dispatched to Mezzaluna. All of the doors were locked when he arrived. A Mezzaluna cook had received a call earlier in the morning from Russo's son, asking if he had worked with Russo the day before because he never returned home. Concerned, the cook drove to the deli where he was met by Officer Frangella, and opened the front door.
>
> Officer Frangella found Russo's body near the back office door on his knees and "facedown with his head in the boxes." The body was "ice cold" and exhibited "lividity in the right arm and hand area[.]" The medical examiner, Tara Briley, who was called to the scene, noticed, upon lifting Russo from the boxes, that he had "a lot of blood covering his face and the left side of his face by his ears." She estimated that Russo had been dead for approximately twelve hours. The autopsy determined that he died from a single gunshot wound to the head, fired at close range.
>
> No spent bullet casings were found at the scene, and a bottle containing Oxycontin was found on a table near the body. Investigator James Napp swept the deli for fingerprints, which revealed one set that did not match those of defendant. No physical evidence recovered from the scene placed defendant at Mezzaluna the night Russo was killed.
>
> John Kissel testified that defendant [Marsh] was one of his best friends, the two having grown up together in Edison. Kissel also knew Troxell from Edison. Kissel owned Alpha Cab Company

(Alpha Cab) where both Troxell and defendant [Marsh] worked as cab drivers.  In October or November of 2008, Kissel, defendant [Marsh], and Troxell were at a bar when Troxell said he wanted Russo killed.  Defendant [Marsh] told Troxell he would do it, at which point Troxell offered defendant $3000 to kill Russo.

On December 15, 2008, at approximately 7:00 p.m., defendant [Marsh] came to Kissel's office at Alpha Cab.  Defendant [Marsh] told Kissel "the thing with Ray [Troxell] and Vinnie [Russo] [was] done."  When Kissel asked what he meant, defendant [Marsh] confirmed that he had killed Russo.  According to Kissel, defendant [Marsh] explained he "went to the deli and walked in the back door to pick up Percocets from Vinnie [Russo].  And they went in Vinnie's [Russo's] office, and Vinnie [Russo] sat down in a chair.  And when Vinnie [Russo] bent down to go to the bottom drawer, [defendant] [Marsh] . . . put a bullet in his head."

After this conversation, Kissel went to Mezzaluna to look for Russo's truck.  Kissel then called Troxell and met him at a Walmart in North Brunswick.  Kissel, Troxell, and defendant [Marsh] later met at Troxell's house where Kissel saw Troxell with "a wad of money on him."  Although Kissel did not see defendant [Marsh] receive the money from Troxell, he testified that defendant [Marsh] left shortly after Troxell walked in defendant's [Marsh's] direction with money in hand.  At around 11:15 p.m. that night, Kissel and Troxell went to the North Brunswick Pub, where defendant [Marsh] arrived a short time later.  [FN 1]

> [FN 1] The testimony of a barmaid at the pub, and surveillance tapes from the bar corroborated the meeting.

Kissel told Lieutenant David Irizarry, of the Metuchen Police Department, that his two friends had murdered Russo.  He then gave a recorded statement to Sergeant Paul Miller, of the Middlesex County Prosecutor's Office, the lead investigator on the case, and other officers on December 18, 2010.  Kissel told them he was present at the pub when Troxell said he wanted Russo killed and defendant [Marsh] said he would do it for $3000; he heard defendant [Marsh] say "he took care of the thing between Vinnie [Russo] and Ray [Troxell]"; and he observed what he believed to be an exchange of money between defendant [Marsh] and Troxell the night of December 15.  Kissel turned over to police a bullet his dispatcher found in a desk at Alpha Cab.

The dispatcher testified he saw defendant [Marsh] and Troxell speaking outside the cab company on the afternoon of December 15. He also explained that defendant [Marsh] had previously shown him a loaded "two-shot Derringer" [FN2] he owned. Defendant [Marsh] left one of the Derringer's "very big" bullets in the cab company's office, which the dispatcher put away in a desk. Testimony from the State's ballistics expert revealed that the bullet that produced the fragments found in Russo's body could have been fired from a Derringer.

> [FN 2] A Derringer is a "short-barreled pistol having a large bore." *Webster's New College Dictionary* 306 (2nd ed.1999).

The dispatcher could not confirm defendant's [Marsh's] whereabouts between 6:50 p.m. and 8:10 p.m. on December 15. Specifically, he could not confirm, based on his dispatch records, whether defendant [Marsh] had visited his former fiancée [Bonnie Reed Kasperski], on the night of December 15, or whether he had stopped at a 7–Eleven in Edison at 7:25 p.m., as defendant [Marsh] had asserted in his pre-trial notice of alibi.

Meanwhile, Charles Chicarella, defendant's [Marsh's] friend, testified that on December 15, he was trying to obtain Oxycontin from defendant [Marsh]. Chicarella called defendant [Marsh] several times throughout the day, but was unable to meet him until 10:00 p.m. that night, at which time defendant [Marsh] gave him two pills. The pills produced at trial looked the same as those in the bottle found by Russo's body.

The State then offered the testimony of Sgt. Miller. On December 17, 2008, Lt. Irizarry contacted him [Sergeant Miller] about Kissel's statement. Two days later, Sgt. Miller interviewed Troxell, after which he arrested him for Russo's murder. The police then sought to locate defendant [Marsh]. At approximately 4:00 a.m. on December 19, 2008, the Pennsylvania State Police located and arrested defendant [Marsh] at his home in Macungie, Pennsylvania.

Defendant [Marsh] lived in a garage attached to a large home. Sgt. Miller and other law enforcement officers executed a search warrant for defendant's [Marsh's] home. Inv. Napp testified that law enforcement retrieved a total of eight long-arm guns and two handguns from defendant's [Marsh's] residence. Defendant [Marsh] legally owned all of the recovered guns, none of which were determined to be the murder weapon. A records check revealed that

defendant [Marsh] "ha[d] no firearms registered in the State of New Jersey," nor a permit to carry or purchase firearms.

Sgt. Miller's team also seized a coffee can filled with .22 caliber rounds because Russo's injuries "appeared to be from a small caliber handgun." Sgt. Miller and Inv. Napp both testified they found an empty American Derringer "gun box." Law enforcement, however, never found the gun that fit this particular box.

Without objection, defendant's [Marsh's] landlord, who frequently hunted deer with defendant [Marsh], testified that defendant [Marsh] owed him approximately $3000 in unpaid rent. In the search of defendant's [Marsh's] home, police recovered $197 in cash. They later learned from defendant's [Marsh's] fiancée [Kasperski] and her father that they found $2000 in defendant's [Marsh's] kitchen cabinet. Nothing found in defendant's [Marsh's] home directly linked him to the crime scene.

In addition, as part of his investigation, Sgt. Miller received phone records, which showed repeated contact between defendant [Marsh], Troxell, and Kissel on December 15, and again on December 16, 2008. The phone records reflect that a series of calls were made from defendant's [Marsh's] cellphone. While traveling to Alpha Cab, defendant [Marsh] called Kissel three consecutive times, each call lasting between seven and nine seconds. Sgt. Miller noted the signals bounced off certain cell towers in East Brunswick at Exit 9 of the Turnpike, indicating defendant's [Marsh's] northerly direction of travel away from the crime scene at 7:09 p.m., until the time he arrived at Alpha Cab some time shortly thereafter. Defendant [Marsh] also called Troxell's cell phone on December 16 at approximately 3:33 p.m., at which time investigators were interviewing Troxell. At approximately 4:23 p.m., within thirty minutes of his interview by police, Troxell placed an outgoing call to defendant's [Marsh's] cell phone.

Defendant's [Marsh's] fiancée [Kasperski] testified on defendant's [Marsh's] behalf as his alibi witness. She explained defendant [Marsh] loved hunting and fishing, and that he owned several rifles and handguns. She could not recall ever having seen an American Derringer in defendant's [Marsh's] home. On December 15, she was working at the Metuchen Dental Group from 10:30 a.m. to 8:00 p.m. She testified she saw defendant [Marsh] between 7:30 p.m. and 8:00 p.m. She described his demeanor as "normal" at that time. He remained with her for ten or fifteen minutes. She left work at 8:00 p.m., at which point she went to her parents' house where defendant [Marsh] arrived around midnight.

5

Defendant [Marsh] also took the stand.  He admitted owning an American Derringer, but denied knowing its whereabouts.  He recalled showing the Derringer to someone at Alpha Cab, as he often brought a gun with him for protection during his shifts.  He testified he did not, however, have a gun with him during his shift on December 15.  As to the remainder of his gun collection, he confirmed he owned approximately seven or eight rifles and shotguns, which he used to hunt deer and turkey.  He also legally owned six handguns, including a Derringer.  He denied owning any copper colored bullets similar as those found in Russo's body.

Defendant [Marsh] admitted he regularly took Oxycodone for a stomach condition.  He also acknowledged he sold two Oxycodone pills to Chicarella on December 15, at around 10:00 p.m.  He obtained the pills he sold to Chicarella from a man named Coney.  He made several calls back and forth to Coney that day in order to obtain pills for both himself and for Chicarella.  He denied taking any pills from the bottle found next to Russo's body.

According to defendant [Marsh], he started working for Kissel as a cab driver in 2007, and was always paid in cash, which he kept in his house.  On December 15, he worked from 2:00 p.m. until approximately 11:00 p.m.  At around 6:00 p.m., he was driving his cab in Piscataway making his usual pick up.  By the time he finished, it was approximately 6:30 p.m., at which point he went back to the cab stand, arriving at approximately 6:50 p.m.

Defendant [Marsh] had been at the cab stand for a few minutes when Kissel arrived in a hurry.  He confronted Kissel about money Kissel owed him.  He then left in his cab at around 7:20 p.m. and headed to the Edison train station to pick up fares.  He recalled stopping at a 7–Eleven before driving to his fiancée's [Kasperski's] place of employment in Metuchen, where he arrived sometime between 7:30 p.m. and 8:00 p.m.  [FN 3]  He left her job around 8:00 p.m. and drove to Woodbridge to pick up another fare.  He denied being at Troxell's home at 9:00 p.m. that night.

> [FN 3] Sgt. Miller's attempt to retrieve the surveillance tapes from the 7–Eleven was unsuccessful.  He learned the tape from December 15 had been recorded over per store policy.

After making another pick up at the Edison train station, he returned to the cab stand sometime after 9:00 p.m. where he stayed until he met Chicarella at 10:00 p.m.  He then drove to North Brunswick to

meet Kissel for a drink.  While at the bar, where defendant [Marsh] remained for ten to fifteen minutes, he received a call from the dispatcher to return to the cab stand to cash out for the night.  After doing so, defendant [Marsh] returned to the North Brunswick Pub where he and Troxell walked away to talk about Kissel, who, according to defendant, was acting "very strange that night."

The three men left the bar, at which point they went to Troxell's house because Kissel had told defendant [Marsh] that Troxell would pay him the money Kissel owed him.  Kissel and Troxell walked away while defendant [Marsh] sat in the kitchen with Troxell's wife.  When Kissel returned to the kitchen, he paid defendant [Marsh] the money he owed him, at which point defendant [Marsh] left the house.  Defendant [Marsh] returned to the cab stand to drop off the cab and then drove to his fiancée's parent's house in his personal car.

*State v. Marsh*, No. A-6279-10T2, 2014 WL 5285636, at *1–5 (N.J. Super. Ct. App. Div. Oct. 16, 2014).

Petitioner went to trial in January 2011.  Ultimately, as previously described, a jury convicted him of first-degree murder for hire and two counts of unlawful possession of a weapon.  Petitioner received a life sentence on the murder conviction and ten years imprisonment on each of the unlawful possession of a weapon convictions to run concurrently to his life sentence for murder.

Petitioner filed a direct appeal to the New Jersey Superior Court, Appellate Division, raising several claims.  Several claims raised issues of prosecutorial misconduct.  One of those claims, which is most relevant to this federal habeas petition was that the trial court should have granted his motions for mistrial or for a new trial because of the cumulative effect of prosecutorial misconduct during his trial.  Petitioner's conviction and sentence were affirmed by the New Jersey Superior Court, Appellate Division.[1]  *See id.* at *18.  The New Jersey Supreme Court denied

---

[1] The Appellate Division did remand the matter to correct Petitioner's judgment of conviction to reflect the merger of Petitioner's unlawful possession of a weapon convictions with his murder conviction.  *See Marsh*, 2014 WL 5285636, at *18.

certification on Petitioner's direct appeal without discussion.  *See State v. Marsh*, 112 A.3d 592 (N.J. 2015).

Petitioner then filed a post-conviction relief ("PCR") petition in the New Jersey Superior Court, Law Division.  (*See* ECF 19 at 30-36).  Petitioner raised ineffective assistance of counsel claims for counsel's failure to object to several of the prosecutor's statements and actions during his trial as well as for trial counsel's cumulative error.  The New Jersey Superior Court denied Petitioner's PCR petition in a written opinion on June 13, 2016.  (*See id.* at 37-48).  The New Jersey Superior Court, Appellate Division affirmed the denial of Petitioner's PCR petition in a written opinion dated April 26, 2018.  *See State v. Marsh*, Dkt. No. A-5189-15T1, 2018 WL 1954802 (N.J. Sup. Ct. App. Div. Apr. 26, 2018).  The New Jersey Supreme Court then denied certification without discussion.  *See State v. Marsh*, 197 A.3d 654 (N.J. 2018).

Petitioner then filed this federal habeas petition in this Court.  Petitioner raises three claims. Two of the claims, however, have numerous subclaims.  In Claim I, Petitioner raises numerous ineffective assistance of counsel claims, which are as follows:

1. Trial counsel failed to object multiple times to improper statements/arguments made by the prosecutor in his opening statement and during summation ("Claim I(a)");

2. Trial counsel failed to object to the prosecutor's impugning of Petitioner's witness Bonnie Reed Kasperski ("Claim I(b)");

3. Trial counsel failed to request a limiting charge when the prosecutor brought out a financial motive for the crime and trial counsel invited this error ("Claim I(c)");

4. Trial counsel failed to object and request a limiting instruction regarding Sergeant Miller's questioning of co-defendant Troxell, which unfairly implicated Petitioner and his arrest ("Claim I(d)"); and

5.   Trial counsel failed to object to the presentation of guns in the courtroom ("Claim I(e)").

(*See* ECF 1 at 5).   In Claim II, Petitioner raises numerous arguments related to prosecutorial misconduct, which are as follows:

1.   Prosecutor improperly switched the burden of proof to Petitioner ("Claim II(a)");

2.   Prosecutor committed misconduct by stating that the victim Russo would say "Marsh killed him" ("Claim II(b)");

3.   Prosecutor offered improper financial motive for Petitioner purportedly killing Russo ("Claim II(c)");

4.   Prosecutor implied superior knowledge by allowing Sergeant Miller to testify after taking statement from Troxell that Petitioner was arrested ("Claim II(d)");

5.   Prosecutor committed misconduct by eliciting from a witness to say they only follow evidence which implied police only arrest guilty people ("Claim II(e)");

6.   Prosecutor committed misconduct by asking why Petitioner did not call certain witnesses or utilize surveillance video that did not exist ("Claim II(f)");

7.   Prosecutor committed misconduct by continuing to ask questions to Petitioner of Petitioner's gun ownership when such guns were not used in the crime ("Claim II(g)"); and

8.   Prosecutor committed misconduct when he stated that Petitioner laid in wait to commit the murder and paraded guns before the jury ("Claim II(h)").

(*See* ECF 1 at 7).   In Claim III, Petitioner raises a cumulative error claim due to his claims for ineffective assistance of counsel and prosecutorial misconduct.   (*See* ECF 1 at 8).

Respondents oppose Petitioner's habeas petition.   (*See* ECF 8).   Petitioner filed a reply brief in support of his habeas petition.[2]   (*See* ECF 21).

---

[2] Petitioner's reply brief makes additional claims not contained within Petitioner's initial habeas petition.   For example, Petitioner admits he is submitting for the first time that the prosecutor

## III.    LEGAL STANDARD

An application for writ of habeas corpus by a person in custody under judgment of a state court can only be granted for violations of the Constitution or laws or treaties of the United States. *See Engle v. Isaac*, 456 U.S. 107, 119 (1982); *see also Mason v. Myers*, 208 F.3d 414, 415 n.1 (3d Cir. 2000) (citing 28 U.S.C. § 2254).  Petitioner filed this petition for writ of habeas corpus after April 24, 1996, thus, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. 104-132, 110 Stat. 1214 (Apr. 24, 1996), applies.  *See Lindh v. Murphy*, 521 U.S. 320, 326 (1997).  Under AEDPA, federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court.  *See* 28 U.S.C. § 2254(d).

As a threshold matter, a court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'"  *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003) (quoting 28 U.S.C. § 2254(d)(1)).  "'[C]learly established federal law' under § 2254(d)(1) is the governing legal principle set forth by the Supreme Court at the time the state court renders its decision."  *Id.* (citations omitted).  A federal habeas court making an unreasonable

---

displayed a picture of Petitioner with the phrase guilty during his summation.  Furthermore, Petitioner also argues for the first time that the prosecutor knowingly allowed Kissel to offer false testimony.  Petitioner has not sought to amend his habeas petition through filing a motion to amend. Furthermore, a petitioner cannot raise claims for the first time in a reply brief such that they will not be considered by this Court.  *See Judge v. United States*, 119 F. Supp. 3d 270, 284 (D.N.J. 2015).  Additionally, it appears that such claims were never raised before the state courts such that they would be deemed unexhausted as well.  *See, e.g.*, *Bruce v. Powell*, No. 19-13028, 2021 WL 5565166, at *6 (D.N.J. Nov. 29, 2021) (noting habeas claim raised for the first time in a reply brief to a habeas petition is unexhausted).

application inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *See Williams v. Taylor*, 529 U.S. 362, 409 (2000). Thus, "a federal court may not issue a writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. Furthermore, a federal court must accord a presumption of correctness to a state court's factual findings, which a petitioner can rebut only by clear and convincing evidence. *See* 28 U.S.C. § 2254(e); *see also Rice v. Collins*, 546 U.S. 333, 339 (2006) (petitioner bears the burden of rebutting presumption by clear and convincing evidence); *Duncan v. Morton*, 256 F.3d 189, 196 (3d Cir. 2001) (factual determinations of state trial and appellate courts are presumed to be correct).

The AEDPA standard under § 2254(d) is a "difficult" test to meet and is a "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). A petitioner carries the burden of proof and with respect to review under § 2254(d)(1), that review "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen*, 563 U.S. at 181.

In applying AEDPA's standards, the relevant state court decision that is appropriate for federal habeas corpus review is the last reasoned state court decision. *See Bond v. Beard*, 539 F.3d 256, 289-90 (3d Cir. 2008). Furthermore, "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991); *see also Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018); *Rambo v. Adm'r East Jersey State Prison*, 762 F. App'x 105, 107 (3d Cir. 2019) (noting the applicability of *Ylst*'s "look through" doctrine; *Dennis Sec'y*

*Dep't of Corr.,* 834 F.3d 263, 353 n.10 (3d Cir. 2016) (Jordan, J., concurring in part and concurring in the judgment) (noting that while *Ylst* predates the passage of AEDPA, the *Ylst* presumption that any subsequent unexplained orders upholding the judgment will be presumed to rest upon the same ground is still valid).

## IV.   DISCUSSION

The Court will first analyze Petitioner's prosecutorial misconduct claims raised in Claim II as it will assist in deciding Petitioner's ineffective assistance of counsel claims raised in Claim I.

### A.  Claim II – Prosecutorial Misconduct

Petitioner raises multiple prosecutorial misconduct claims within Claim II.  This Court will separately analyze each one.

#### 1.  *Burden Shifting*

In Claim II(a), Petitioner argues that the prosecutor committed misconduct by impermissibly shifting the burden of proof at his criminal trial to Petitioner rather than having it properly remain with the State.  The last reasoned decision on this claim is from the New Jersey Superior Court, Appellate Division during Petitioner's direct appeal, which analyzed this claim as follows:

> Prosecutors must act in accordance with fundamental principles of fairness.  *State v. Wakefield,* 190 *N.J.* 397, 436 (2007), *cert. denied,* 552 *U.S.* 1146, 128 *S. Ct.* 1074, 169 *L. Ed.* 2d 817 (2008).  They may be zealous in enforcing the law, but must refrain from engaging in "conduct lacking in the essentials of fair play[.]"  *Id.* at 437 (internal quotation marks omitted).  Prosecutors "'should not make inaccurate legal or factual assertions during a trial and . . . must confine their comments to evidence revealed during the trial and reasonable inferences to be drawn from that evidence.'"  *Ibid.* (quoting *State v. Reddish,* 181 *N.J.* 553, 641 (2004)).  Further, they may never shift the burden of proof to defendant.  *See State v. Loftin,* 146 *N.J.* 295, 389 (1996).

When reviewing a prosecutor's statements, an appellate court must evaluate "the severity of the misconduct and its prejudicial effect on the defendant's right to a fair trial and conclude that prosecutorial misconduct is not grounds for reversal of a criminal conviction unless the conduct was so egregious as to deprive defendant of a fair trial." *Wakefield, supra,* 190 *N.J.* at 437 (internal quotation marks omitted). To that end, reversal is justified when the prosecutor's conduct was "clearly and unmistakably improper" and "substantially prejudiced defendant's fundamental right to have a jury fairly evaluate the merits of his defense." *State v. Papasavvas,* 163 *N.J.* 565, 625 (2000). . . .

Defendant claims the State improperly shifted the burden of proof onto him to prove his alibi by commenting during opening remarks that defendant would be calling his fiancée as an alibi witness. Defense counsel objected after the State's opening, arguing the State had "thrown a ball in [his] lap" because it had referenced testimony of his fiancée. The trial court overruled the objection, noting defendant had provided notice of an alibi.

When making opening statements, prosecutors should limit comments to the facts [they] intend[ ] in good faith to prove by competent evidence [.]" *State v. Echols,* 199 *N.J.* 344, 360 (2009) (internal quotation marks omitted). Because "[t]he purpose of a prosecutor's opening statement is to present to the jury an outline or summary of what the State expects to prove [,] [p]rosecutors should limit themselves in their openings to what they will prove[.]" *State v. W.L.,* 292 *N.J. Super.* 100, 108 (App.Div.1996) (quoting *State v. Ernst,* 32 *N.J.* 567, 577 (1960), *cert. denied,* 364 *U.S.* 943, 81 *S. Ct.* 464, 5 *L. Ed.* 2d 374 (1961)).

Here, the prosecutor stated in his opening:

> "[T]here's going to be a suggestion . . . that Frank Marsh was not at the scene of the crime when this occurred. That defense is going to be very weak because at best [defendant's fiancée] who will testify along those lines would only say that she was with Frank between 7:30 and 8:00 and she would say that she saw him in Metuchen where she works at a dental practice which is not far away."

In this instance, when the prosecutor made reference to defendant's fiancée's anticipated testimony and expressed his opinion that this evidence was a "weak defense," the prosecutor strayed beyond the

scope of what is anticipated in a prosecutor's opening statement. The statement, however, was only made once and almost immediately thereafter, the prosecutor told the jury that he was not before the jury "to get into defenses or arguments. Frankly the rules don't allow it."

Further, the court had already informed the jury during preliminary instructions that the attorneys' comments were not evidence. Likewise, in its final instructions to the jury, the court reiterated that "regardless of what counsel said, you know, arguments of counsel, opening statements, summation, remarks, colloquy back and forth, it's not evidence." These timely and effective instructions informed the jury on the limited use of the remarks. *See Wakefield, supra,* 190 *N.J.* at 440 (holding that prompt and effective instructions have the ability to neutralize prejudice engendered by an inappropriate comment or piece of testimony). In this light, we reject the claimed error.

As further support for his argument that the prosecutor's remarks had the effect of shifting the burden of proof, defendant [Marsh] focuses on the State's cross-examination, during which the prosecutor asked him whether he attempted to secure surveillance tapes from the 7–Eleven he claimed to have visited the night of Russo's murder. Defense counsel raised an objection, which the court immediately sustained. Outside the presence of the jury, the court characterized the State's implication that defendant [Marsh] had failed to obtain exculpatory evidence as "unfair," and the judge further permitted the State to recall Sgt. Miller to clarify to the jury that the store's tapes had in fact been recorded over by the Store before defendant [Marsh] was charged.

In sustaining defendant's [Marsh's] objection, the judge explained in the presence of the jury, that "[n]o obligation rests upon defendant. . . . If that information was supplied to you on that date, you had equal access to any information and have the obligation of proving this case." Also during the State's summation, the judge interrupted to explain that "[t]he defense has no burden to supply you with anything." Finally, in the final charge the judge reiterated the law as to the State's burden to prove all elements of its case.

We discern that the court's timely instructions were sufficient to cure any potential prejudice generated by the prosecutor's questions during cross-examination. *See State v. Jenkins,* 349 *N.J. Super.* 464, 479 (App. Div. 2002) (curative instruction alleviated any prejudice from prosecutor's comments allegedly suggesting the defense had

> burden of proof).  We therefore conclude the prosecutor's comments
> in this specific context do not warrant reversal.

*Marsh*, 2014 WL 5285636, at *5–7.

A criminal defendant's due process rights are violated if prosecutorial misconduct renders a trial fundamentally unfair.  *See Darden v. Waingright,* 477 U.S. 168, 182–83 (1986).  A habeas petition will be granted for prosecutorial misconduct only when the misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Id.* at 181 (internal quotation marks and citation omitted).  A prosecutorial misconduct claim is examined in "light of the record as a whole" in order to determine whether the conduct "had a substantial and injurious effect or influence" on the jury's verdict.  *See Brecht v. Abrahamson,* 507 U.S. 619, 638, (1993).  A "reviewing court must examine the prosecutor's offensive actions in context and in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant."  *Moore v. Morton,* 255 F.3d 95, 107 (3d Cir. 2001).

The Appellate Division's denial of this claim was not contrary to nor an unreasonable application of clearly established federal law, nor was its denial based on an unreasonable determination of the facts.  As the Appellate Division noted, during preliminary and closing instructions to the jury, the trial judge properly instructed the jury that opening and closing statements were not evidence.  (*See* ECF 10-3 at 13-15; ECF 15-2 at 9, 53).  Furthermore, as noted by the Appellate Division, during the cross-examination of Petitioner by the state, when the prosecutor began to ask him about whether he knew about surveillance cameras at 7-Eleven stores, the trial judge immediately sustained Petitioner's counsel's objection and instructed the jury that no obligation rested upon Petitioner.  (*See* ECF 15 at 71).  The jury is presumed to have followed these instructions by the trial judge.  *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000).

Additionally, the quantum of evidence produced at trial implicated Petitioner in Russo's murder. First, and most importantly, Kissel testified that he heard Troxell and Petitioner agree that Petitioner would kill Russo for $3,000 prior to the murder. (*See* ECF 14 at 41). Subsequently, on the day Russo was killed, Kissel testified that Petitioner confessed to killing Russo. (*See id.* at 41, 42). While Kissel testified that he did not see the actual transfer of money between Troxell and Petitioner, he did testify that he saw Troxell with a wad of money in his hand shortly after the Russo murder and that Petitioner left the pub shortly after Troxell had walked in his direction. (*See id.* at 47). Other evidence that implicated Petitioner included the testimony from Chicarella who indicated that the pills he received from Petitioner on the night Russo was killed looked the same as those that were found next to Russo's body when he was discovered after the murder. (*See* ECF 13-1 at 25).

In addition to the evidence noted above, cell phone records were introduced that demonstrated that Petitioner was traveling away from the crime scene at approximately 7:09 p.m. on the night of the murder, which, based on the State's theory, was shortly after the murder. (*See* ECF 13-2 at 78-80). Furthermore, while Petitioner worked at the cab company on the date of Mr. Russo's murder, the dispatcher could not note Petitioner's whereabouts at or around the time Mr. Russo was killed. Petitioner's cab dispatcher testified that Petitioner began his day on December 15, 2008, at 2:00 p.m. (*See* ECF 13-1 at 41). The dispatcher testified he could not confirm Petitioner's whereabouts from 6:50 p.m. to 7:20 p.m. on the night of Mr. Russo's murder, or the timeframe for when Mr. Russo was murdered. (*See* ECF 13-1 at 88-89). Finally, Petitioner testified to owning an American Derringer firearm, which is consistent with the weapon used in the murder and Petitioner did not know of its whereabouts. (*See* ECF 14-2 at 6).

Given the quantum of evidence produced at trial, coupled with the judge's numerous trial instructions both curative and general, this Court finds that the state court's denial of this prosecutorial misconduct claim was not contrary to or an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts.

2.   *Stating Victim Would Say "Marsh killed him"*

Next, Petitioner claims that he is entitled to federal habeas relief for prosecutorial misconduct due to the prosecutor stating during opening argument, "[n]ow, obviously, if Vinnie Russo was here to testify he would tell us that Frank Marsh shot and killed him, but for obvious reasons that's not going to happen." (ECF 11 at 19). Petitioner alluded to this comment by the prosecutor in his "Statement of Facts" section in his direct appeal brief to the New Jersey Superior Court, Appellate Division. (*See* ECF 17-2 at 14). In Petitioner's legal argument section on direct appeal, Petitioner then stated that the "most egregious" instances of prosecutorial misconduct were set forth in his Statement of Facts and Petitioner incorporated his Statement of Facts within certain categories that he then listed in his legal argument. (*See id.* at 33). The Appellate Division on direct appeal, did not expressly address this issue. Given Petitioner's statement that he was incorporating the statements of the prosecutor as set forth in his Statement of Facts into his legal argument, this Court finds Petitioner did raise this issue on direct appeal. In concluding that Petitioner was not entitled to relief on any of his prosecutorial misconduct claims, the Appellate Division noted as follows in summing up and rejecting all of Petitioner's cumulative prosecutorial misconduct arguments:

> We have carefully examined the record concerning the alleged improprieties by the prosecutor. While we do not condone those comments made by the prosecutor, which were inappropriate, we are convinced defendant [Marsh] was not deprived of a fair trial.

> This was a lengthy trial spanning sixteen days. In that regard the
> prosecutor's conduct must be viewed in the context of a protracted
> trial. [*State v.*] *Engel*, . . . 249 *N.J. Super.* [336,] at 382 [(N.J. Sup.
> Ct. App. Div. 1991)]. Therefore, viewing the trial as a whole, we
> are satisfied the trial judge appropriately and promptly addressed
> what the record shows were lapses in judgment by the prosecutor.
> The judge's general and curative instructions appropriately provided
> the jury with the guidance it needed to reach a fair trial and
> sustainable verdict based on the evidence presented at trial, and
> obviated any lingering potential for prejudice." *Ibid.*

*Marsh*, 2014 WL 5285636, at \*14.

The prosecutor's statement regarding what Russo would have testified to was certainly improper as it was not, nor could it ever have been based on admissible evidence given Russo was the murder victim. However, a court must also weigh the effect of the curative instructions, and the quantum of evidence against the defendant in assessing whether the state court's denial of this claim runs afoul of AEDPA's standard of review. *Moore,* 255 F.3d at 107.

First, as noted in *supra* Part IV.A.1, the trial judge instructed the jury that the prosecutor's statements during his opening and closing were not evidence. The jury is presumed to have followed those instructions. *See Weeks*, 528 U.S. at 234. Furthermore, the quantum of evidence produced at trial against Petitioner, included his confession of murdering Russo to Kissel, as well as other circumstantial evidence linking Petitioner to the crime such as Chicarello's testimony, which linked Petitioner to the pills found next to Russo's body when he was murdered, cell phone evidence previously described, the fact that the dispatcher could not state Petitioner's location at the time of the murder and Petitioner's recognition of owning an American Derringer, but his inability to locate it post-murder. Based on the trial judge's instruction and the quantum of evidence in this case, notwithstanding the impropriety of the prosecutor's remarks regarding how Russo would have testified, this Court cannot find that the state court's denial of this claim was

contrary to or an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts.

### 3.  *Offering Improper Financial Motive*

Petitioner next argues that the prosecutor improperly offered a financial motive for Petitioner to kill Russo.  The last reasoned decision on this claim was from the New Jersey Superior Court, Appellate Division during Petitioner's direct appeal, which denied this claim as follows:

> Next, defendant contends the prosecutor impermissibly elicited testimony on his financial condition in order to imply that defendant killed Russo for financial gain.  During cross-examination, without objection from defendant, the prosecutor elicited testimony from defendant's landlord that defendant was six months behind on his rent, for a total of $3000.  The State sought to use this evidence to establish that defendant had a pecuniary interest in killing Russo. The court ruled that while highlighting defendant's alleged poverty as a motive for killing Russo was impermissible, presenting evidence that he was behind on certain debts, and paid those debts with money other than that obtained through normal employment, was a permissible inference for the jury to draw.

> The record reveals that defense counsel, outside the presence of the jury, conceded the State may argue defendant's financial motivation for killing Russo in its summation:

>> [COURT]: So you agree that, in fact, the State can say that this is a financially motivated crime and you may consider the need that this defendant may have had?
>> [DEFENSE COUNSEL]: I mean, I hung it out there, Judge . . . I think it's a fair comment.
>> [COURT]: Counsel, you may, in fact, address it, but I tell you walk very gingerly.  Don't overdo it.  Keep your comments limited to one or two sentences as [defense counsel] did. And I think that would balance it out.

> Generally, it is improper to use poverty or lack of financial means as evidence of the defendant's motive to commit a crime.  *State v. Mathis,* 47 *N.J.* 455, 469–72 (1966) ("[T]here must be something more than poverty to tie defendant into a criminal milieu."); *State v. Terrell,* 359 *N.J. Super.* 241, 247 (App. Div.) (noting that use of a

> defendant's poverty to establish motive is improper), *certif. denied*, 177 *N.J.* 577 (2003).
>
> Given defendant's concession, as well as the permissible inference that could be drawn from the State's evidence, we discern no misconduct in the State's reference to the status of defendant's finances at the time of Russo's murder.

*Marsh*, 2014 WL 5285636, at *7.

Initially, this Court notes that federal habeas relief is available for errors of federal law, not state law. *See Estelle*, 502 U.S. at 67-68 ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions). Petitioner does not point to any United States Supreme Court precedent that holds that a prosecutor's reference to a defendant's financial condition amounts to a constitutional violation. Indeed, in similar cases, courts have determined that a New Jersey state prisoner bringing a federal habeas claim that the state improperly referenced a defendant's economic status did not demonstrate that a state court's ruling was contrary to or an unreasonable application of *federal* law. *See Tucker v. Warren*, No. 13-2908, 2016 WL 3010535, at *5 (D.N.J. May 25, 2016). *Tucker* is persuasive such that habeas relief is not warranted on this claim.

Further, as noted by the Appellate Division, the State was not raising Petitioner's financial condition as motive that under *Mathis* would be deemed improper, but rather to tie it to the fact that Petitioner was in debt for $3,000 to his landlord. Thus, the prosecutor's comments were not merely mentioning Petitioner's general poverty to tie Petitioner to the criminal milieu. Finally, defense counsel admittedly opened the door for the prosecutor's argument during closing arguments by raising the specter that Kissel had more of a financial need to commit the crime than Petitioner. (*See* ECF 15-2 at 17).

Given these circumstances, this Court fails to see prosecutorial misconduct.  Furthermore, like *Tucker*, this Court does not find that the denial of this claim by the Appellate Division was contrary to, or an unreasonable application of clearly established *federal* law, or that the denial of this claim was based on an unreasonable determination of the facts.  Thus, this federal habeas prosecutorial misconduct claim is denied.

### 4.   *Implying Superior Knowledge*

Next, Petitioner argues that the prosecutor committed misconduct by allowing Sergeant Miller to testify about taking a statement from co-defendant Troxell, and thereafter, that Petitioner was arrested.  Petitioner claims this implied superior knowledge.  The last reasoned decision on this claim was from the New Jersey Superior Court, Appellate Division during Petitioner's direct appeal, which analyzed and denied this claim as follows:

> Defendant next argues the State introduced inadmissible hearsay that violated his Sixth Amendment rights.  Specifically, he asserts the introduction of Sgt. Miller's testimony referencing Troxell's custodial statement created an inference Troxell had implicated defendant in Russo's murder, without allowing defendant the right to confront or challenge Troxell.  *See State v. Bankston,* 63 *N.J.* 263 (1973).  Once again, because defendant failed to object to Sgt. Miller's testimony in this regard, we review this issue as plain error. *R.* 2:10–2.

> The State argues that it is entitled to detail the progression and evolution of the murder investigation.  Moreover, the State points out the trial court protected defendant's right to a fair trial by instructing the jury not to speculate about Troxell's statement.

> On direct examination, Sgt. Miller testified about the investigative events that followed Russo's death.  On December 18, he and other officers interviewed Kissel.  In response to the prosecutor's question of what he did after meeting with Kissel, the following exchange ensued:

>> [MILLER]: We interviewed Raymond Troxell.
>> [STATE]: Now, you know that you can't tell us what he said, right?

      [MILLER]: Right. I know that.

      [STATE]: How long was this interview?

      [MILLER]: Three hours and 17 minutes.

      [STATE]: Was it recorded?

      [MILLER]: It was, yes.

. . . .

      [STATE]: After the video or the statement was taken, what, if anything, did you do with respect to Mr. Troxell?

. . . .

      [MILLER]: He was placed under arrest.

      [STATE]: What was he charged with?

      [MILLER]: Murder.

      [STATE]: Was [defendant] under arrest at this point in time?

      [MILLER]: He was not under arrest at this point, no.

      [STATE]: After the statement that you took from Mr. Troxell was concerned [sic], did you make an attempt to find [defendant]?

      [MILLER]: Yes.

      [STATE]: Was that the next thing you did?

      [MILLER]: Yes.

      [STATE]: When did you do that?

      [MILLER]: Immediately following our time with Mr. Troxell we then began making efforts to locate [defendant].

      [STATE]: Was he eventually located?"

      [MILLER]: Yes.

      [STATE]: When?

. . . .

      [MILLER]: At approximately 4 a.m. on December 19th, 2008, Frank Marsh was arrested.

Evaluation of defendant's argument is guided by *Bankston* in which the Supreme Court held:

> It is well settled that the hearsay rule is not violated when a police officer explains the reason he approached a suspect or went to the scene of the crime by stating that he did so "upon information received." Such testimony has been held to be admissible to show that the officer was not acting in an arbitrary manner or to explain his subsequent conduct. However, when the officer becomes more specific by repeating what some other person told him concerning a crime by the accused the testimony

violates the hearsay rule.  Moreover, the admission of such testimony violates the accused's Sixth Amendment right to be confronted by witnesses against him.

[*Id.* at 268–69. (citations omitted).]

The *Bankston* Court added that, "[wh]en the logical implication to be drawn from the testimony leads the jury to believe that a non-testifying witness has given the police evidence of the accused's guilt, the testimony should be disallowed as hearsay." *Id.* at 271. "The common thread that runs through *Bankston* [and its progeny] is that a police officer may not imply to the jury that he possesses superior knowledge, outside the record, that incriminates the defendant." *State v. Branch,* 182 *N.J.* 338, 351 (2005).

We are not persuaded that the State eliciting this testimony from Sgt. Miller, or the court admitting the testimony was error.  The testimony was not improper as it merely explained the course of the investigation at that point in time.  Even assuming the testimony was prejudicial because the jury could have inferred that Troxell implicated defendant in the murder, the court's timely instruction that the jury was not to "speculate, guess or wonder what was in a statement that is not before [it] and has nothing to do with this gentleman, this defendant," cured any potential prejudice.  The jury is presumed to understand and follow the court's instructions. *State v. Burns,* 192 *N.J.* 312, 335 (2007).  We conclude that the testimony was not clearly capable of producing an unjust result.

*Marsh*, 2014 WL 5285636, at *8–10.

The Appellate Division's denial of this prosecutorial misconduct claim was not contrary to or an unreasonable application of clearly established federal law, nor was the denial based on an unreasonable determination of the facts.

"The Confrontation Clause is commonly implicated when a witness refers to specific information from a non-testifying third party." *See Turner v. Warden*, No. 18-17384, 2022 WL 951309, at *8 (D.N.J. Mar. 30, 2022).  The Confrontation Clause of the Sixth Amendment states that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. Const. amend. VI.  "The Fourteenth Amendment renders the

[Confrontation] Clause binding on the States." *Michigan v. Bryant,* 562 U.S. 344, 352 (2011) (citing *Pointer v. Texas*, 380 U.S. 400, 403 (1965)).   Pursuant to the Confrontation Clause, "[t]estimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Crawford v. Washington,* 541 U.S. 36, 59 (2004) (footnote omitted).   "As to the second requirement, the Confrontation Clause requires that a defendant have had 'a full and fair opportunity to probe and expose [testimonial] infirmities' of an unavailable government witness in order for that witness's prior testimony to be admissible." *Ross v. Dist. Attorney of Cnty. of Allegheny,* 672 F.3d 198, 206–07 (3d Cir. 2012) (citing *United States v. Owens,* 484 U.S. 554, 558 (1988) (quoting *Delaware v. Fensterer,* 474 U.S. 15 (1985))).   The Confrontation Clause applies to testimonial hearsay that is admitted to establish the truth of the matter asserted.   *See Crawford,* 541 U.S. at 59 n.9 ("The [Confrontation] Clause also does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.") (citation omitted). "[S]tatements made under circumstances that would lead an objective witness reasonably to believe that the statement would be available for use at a later trial are testimonial." *United States v. Hinton,* 423 F.3d 355, 360 (3d Cir. 2005).

Harmless error analysis applies to the admission of testimonial hearsay in violation of the Confrontation Clause. *See United States v. Jimenez,* 513 F.3d 62, 78 (3d Cir. 2008) (citations omitted). Accordingly, to prevail, a habeas petitioner must establish that a constitutional error resulted in "actual prejudice, *i.e.*, that it had a "substantial and injurious effect or influence in determining the jury's verdict." *Eley v. Erickson,* 712 F.3d 837, 847 (3d Cir.2013) (citing *Brecht v. Abrahamson,* 507 U.S. 619, 637–38 (1993)).   In assessing harmless error, some factors courts consider include the importance of the witness's testimony, whether the testimony is cumulative,

the presence or absence of corroborating or contradicting testimony of the witness on material points, the extent of cross-examination permitted and, the overall strength of the prosecution's case. *See Delaware v. Van Arsdall,* 475 U.S. 673, 684 (1986).

Even if this Court were to assume that the prosecutor's questioning implied superior knowledge, any such error was harmless. Indeed, Troxell's interview with Sergeant Miller occurred *after* the Sergeant and other officers had interviewed Kissel who implicated Petitioner in the murder and who did testify at Petitioner's trial and was subject to cross-examination. As previously outlined, at that meeting, Kissel told the investigators that Petitioner had confessed to him that Petitioner had murdered Russo. Thus, any purported implication through the prosecutor's questioning of Sergeant Miller that Petitioner's co-defendant implicated Petitioner would have certainly been cumulative because the investigators already had Petitioner identified as the perpetrator given Kissel's statement to investigators. *Cf. Fogg v. Phelps*, 414 F. App'x 420, 426 (3d Cir. 2011) (where purported statement is cumulative of other evidence properly admitted at trial, purported Confrontation Clause violation is harmless).

Additionally, any possible error by the prosecutor was countered by the trial judge's immediate instruction to the jury following Petitioner's trial counsel's objection. Indeed, the trial judge instructed the jury that with respect to the Troxell statement to Sergeant Miller, the jury was "not to speculate, guess or wonder what was in a statement that is not before you and has nothing to do with this gentleman, this defendant." (ECF 13-2 at 45). The jury is presumed to have followed this instruction. *See Weeks*, 528 U.S. at 234. Finally, the case included the testimony from Kissel, which directly implicated Petitioner in the Russo murder due to Petitioner's confession to Kissel as well as circumstantial evidence such as from Chircarella regarding the similarity of the pills Chircarella received from Petitioner on the night of the murder when

compared to those found near Russo's body as well as the cell phone records, the dispatcher's testimony regarding the inability to account for Petitioner's whereabouts at the time of the murder and Petitioner's owning of an American Derringer but inability to account for its whereabouts. For these reasons, Petitioner is not entitled to federal habeas relief on this prosecutorial misconduct claim based on this record before the Court.

> 5. *Eliciting Testimony from Sergeant Miller Which Implied Police Only Arrest Guilty People*

Petitioner next asserts that the prosecutor committed misconduct during his questioning of Sergeant Miller, which implied that police only arrest guilty people. The last reasoned decision on this claim was from the New Jersey Superior Court, Appellate Division during Petitioner's direct appeal, which analyzed and denied this claim as follows:

> Beginning with defense counsel's cross-examination of Sgt. Miller, counsel asked if he develops a theory as to how a crime may have been committed during the course of an investigation. Sgt. Miller answered affirmatively. Counsel then asked a hypothetical question:
>
> > [DEFENSE COUNSEL]: Well, if the shooting happened at 6:55, based upon your theory
> > . . . .
> > [PROSECUTOR]: Objection. Miller has not testified to any theory that he has.
> > [COURT]: Objection noted.
>
> On re-direct examination, the prosecutor asked [Sergeant] Miller what he did to commence an investigation, to which he replied:
>
> > Well, if we start with a theory, it's just that, it's a theory. Our job is to follow evidence. We don't follow a theory, we follow the evidence. As the evidence progresses, our theory may change. We may have to adjust. But ultimately we follow evidence. And we're here for evidence. And in my career I've never arrested someone based on theory.

Defense counsel objected; the court sustained the objection. The court immediately instructed the jury to disregard Sgt. Miller's comment. In a sidebar discussion on the objection, the judge denied defense counsel's motion for a mistrial, and stated "[t]he jury was given an immediate disregard. . . . [T]his jury is pretty sophisticated. . . . I'm sure they will deal with it appropriately, follow my instructions." The judge cautioned both counsel that "No officer on the stand should be permitted to testify that 'I only arrest guilty people' because it's offering an opinion."

Nothing in the prosecutor's line of questioning suggested an attempt to induce Sgt. Miller to express an opinion of defendant's guilt. Moreover, Sgt. Miller's response that he never arrested anyone based upon a "theory", when considered in the context of his entire response, implies that the sergeant would only arrest based upon the "evidence" because, he stated, "we follow evidence." We discern no misconduct by the prosecutor in this examination. A prosecutor is permitted to "defend the integrity of the investigation." *State v. Engel,* 249 *N.J. Super.* 336, 379 (App. Div. 1991).

*Marsh*, 2014 WL 5285636, at *10–11.

Petitioner fails to show that the Appellate Division's denial of this claim was contrary to or an unreasonable application of clearly established federal law or that the denial was based on an unreasonable determination of the facts. The prosecutor's line of questioning on re-direct was not in error. As the Appellate Division noted, Petitioner's counsel brought up at trial whether Sergeant Miller had a theory of the case and if it might change if Sergeant Miller relied on inaccurate information. (*See* ECF 14 at 28-30). On redirect, the prosecutor asked Sergeant Miller after he commences his investigation, what is it that he is ultimately looking for to which Sergeant Miller responded as noted above. The trial judge then sustained Petitioner's counsel's objection and instructed the jury to disregard Sergeant Miller's statement. (*See* ECF 14-1 at 16-17).

Initially, given that counsel objected, and the trial judge sustained the objection telling the jury to disregard the statement, this Court fails to see how any purported error by the prosecutor in his questioning had a substantial and injurious effect on the jury given the jury is presumed to

have followed the judge's instruction.  *See Weeks*, 528 U.S. at 324.  Furthermore, the prosecutor's questioning was not in error.  Petitioner's counsel on cross-examination of Sergeant Miller elucidated "theories," whereas the prosecutor's questioning on redirect merely sought to bring about Sergeant Miller's testimony to the evidence he relied upon for his investigation.  *See, e.g.*, *State v. Engel*, 592 A.2d 572, 592-93 (N.J. Sup. Ct. App. Div. 1991) (prosecutor's permitted to defend integrity of the investigation in response to defense counsel's statements which characterized state's case as a "big lie").  For these reasons, Petitioner is not entitled to federal habeas relief on this claim.

      6.   *Not Calling Certain Witnesses & Prosecutor's Comments Concerning 7-Eleven Surveillance Tape*

Next, Petitioner asserts that the prosecutor committed misconduct by asking why Petitioner did not call certain witnesses and comments concerning the 7-Eleven surveillance tapes.  With respect to the prosecutor's comments concerning the 7-Eleven surveillance tape, this Court has already analyzed this claim in *supra* Part IV.A.1 and need not do so again here.

With respect to not calling certain witnesses, it is unclear what witnesses Petitioner is referring to.  Indeed, Petitioner's habeas petition does not indicate by name the witnesses the prosecutor was purportedly referring to nor does Petitioner's counseled reply brief identify the witnesses with any particularity.  As such, this Court finds this claim incomplete and conclusory such that federal habeas relief is not warranted.

      7.   *Discussion of Petitioner's Gun Ownership*

Petitioner next asserts that the prosecutor committed misconduct by continuing to ask questions to Petitioner concerning Petitioner's gun ownership when such guns were not used in the crime.  The last reasoned decision on this claim was from the New Jersey Superior Court,

Appellate Division during Petitioner's direct appeal, which analyzed and denied this claim as follows:

> [D]efendant [Marsh] argues the State's repeated reference to his legal gun collection constituted prosecutorial misconduct since none of the weapons recovered from his Pennsylvania home were linked to the shooting in question or to any other crime. Defendant [Marsh] further contends the prosecutor repeatedly ignored the court's directive to refrain from pursuing certain arguments in connection with the guns, such as defendant's skill as a hunter.
>
> The State proffered the admission of evidence related to defendant's [Marsh's] gun collection to show defendant's [Marsh's] familiarity with firearms; that defendant [Marsh] owned an American Derringer weapon, the same type of weapon used to kill the victim; and also that an American Derringer was not found among the firearms that were recovered from the residence. It is undeniable the gun collection was a factor in the State's case. Several witnesses testified to the guns recovered from defendant's [Marsh's] home, including Inv. Napp, Sgt. Miller, the landlord, and defendant's fiancée. Defendant [Marsh] also freely testified to his gun collection, described himself as a "pretty avid outdoorsman", and admitted he owned an American Derringer.
>
> As defense counsel notes, however, the prosecutor often referenced the guns in the context of defendant's [Marsh's] skill as a hunter, which, if anything, suggested an alternative purpose for the admission of the firearms: to show defendant's [Marsh's] propensity to kill. On cross-examination of defendant[Marsh], for example, the State asked,
>
>> [PROSECUTOR]: You testified that you hunt deer and you hunt turkey?
>> [DEFENDANT MARSH]: That's correct.
>> [PROSECUTOR]: And those are two species that require a lot of patience in order to kill?
>> [DEFENDANT MARSH]: Absolutely.
>> [PROSECUTOR]: Absolutely. There's no doubt about that?
>> [DEFENDANT MARSH]: No doubt about it.
>> [PROSECUTOR]: Unlike a pheasant where you might just walk along and it pop ups in front of you and you shoot it?
>> [DEFENDANT MARSH]: It requires patience as well.

> [PROSECUTOR]: You to have to trudge through the woods?
> [DEFENDANT MARSH]: Of course.
> [PROSECUTOR]: Hunting in general requires patience, doesn't it?
> [DEFENDANT MARSH]: Yes, it does.
> [PROSECUTOR]: Okay. So for deer hunting you start off your day when you go hunting deer doing what? Explain to me what you do to go hunting deer.

Defense counsel objected to the relevance of hunting, at which point the court ordered the parties to sidebar. At sidebar, the State explained it was merely testing defendant's [Marsh's] familiarity with guns. The court, however, accused the State of attempting to "address some negative inference he can lay in wait for a person because he can lay in wait for pheasant. I think that's an unfair inference. There's plenty of testimony about his hunting. Move on."

Returning to cross-examination, the prosecutor again asked, "[w]hy is it that you have to be patient?" The court explained to the jury that it had asked the prosecutor to move on and that "[h]unting has nothing to do with this trial. The jury is instructed to disregard this entire line of questioning." The prosecutor persisted in questioning defendant [Marsh] about his shooting practices, at which point the court explained before the jury: "Counsel, the issue of the weapons is tangential. You've covered it. He's familiar with it. He hunts with them and whatever else. I want you to get off the gun issue."

The prosecutor persisted in his summation, arguing that "this case is more than just about $3000. This is about a guy who shot [Russo] with a handgun that he had for a long time probably because he wanted to know what it would feel like." The prosecutor later argued that the case was about more than money, "[i]t was about a guy who had been hunting animals." Defense counsel objected and the court reaffirmed before the jury that "hunting has nothing to do with this case."

In addition to providing curative instructions each time the prosecutor broached the topic of defendant's hunting practices, the court reiterated in its final charge to the jury the limited purpose for which the jury should consider defendant's firearm collection. The final instruction also highlighted the prohibited uses for the evidence, such as evidence of defendant's [Marsh's] propensity to commit murder. *See* [*State v.*] *Nelson*, . . . [803 A.2d 1, 32-33 (N.J. 2002)].

> On appeal, defendant [Marsh] contends the prosecutor's disregard for the court's directives constituted prosecutorial misconduct. As support, defendant relies upon [*State v.*] *Thornton,* . . . 185 A.2d 9, 20 (N.J. 1962)] wherein the Court made clear that prosecutors should "confine their summations to a review of, and an argument on, the evidence, and not indulge in improper expressions of personal or official opinion as to the guilt of the defendant, or in collateral improprieties of any type, lest they imperil otherwise sound convictions." In relying upon *Thornton,* however, defendant fails to note the Court's language that "[i]n a considerable number of cases we and our predecessors have adjudged statements improper but have not reversed because it could not be said that they reached the quality of impropriety which prejudiced the defendant's right to a fair trial." *Ibid.*
>
> Here, the same is true. While the prosecutor's repeated references to defendant's [Marsh's] hunting practices were perhaps excessive, there was sufficient independent evidence upon which the jury could have relied in fairly reaching its verdict. Between Kissel's testimony; the missing murder weapon; defendant's [Marsh's] admission to owning an American Derringer like the weapon used to kill the victim; and the cell phone records, which undercut defendant's alibi; the jury had more than defendant's hunting practices on which to base its decision.

*Marsh*, 2014 WL 5285636, at *12–13.

The Appellate Division's denial of this claim was not contrary to, or an unreasonable application of clearly established federal law, nor was the denial of this claim based on an unreasonable determination of the facts. The Appellate Division's decision analyzed the prosecutor's misstatements against the quantum of the evidence. The Appellate Division's analysis was entirely proper as this Court has already discussed *supra* when deciding a prosecutorial misconduct claim. While one might disagree, this Court cannot reach the conclusion that the Appellate Division's decision was unreasonable. Indeed, the Appellate Division noted various pieces of evidence against Petitioner. Obviously, the most damning evidence against Petitioner was Kissel's testimony that Petitioner confessed to killing Russo. Furthermore, the

Appellate Division also noted the curative instructions which the trial court gave regarding this issue that the jury is deemed to have followed. *See Weeks*, 528 U.S. at 234. Once again, this was proper for the Appellate Division to consider, as noted *supra* in deciding whether the prosecutor's statements had a substantial or injuries effect on the jury's verdict. The Appellate Division ultimately concluded based on the quantum of evidence and curative instructions that the prosecutor's statements about Petitioner's gun ownership did not have a substantial or injurious effect on the jury's verdict. Given this record, including the evidence produced at trial and the trial judge's instructions, Petitioner fails to show that he is entitled to federal habeas relief on this claim even assuming that the prosecutor's statements were improper.

8. *Lying in Wait and Parading Guns before the Jury*

In Plaintiff's final prosecutorial misconduct claim, Petitioner challenges the prosecutor's statements that Petitioner was lying in wait and that the prosecutor paraded Petitioner's legally owned guns before the jury. In summation, the prosecutor stated as follows at trial:

> And while [Marsh] is setting this up, waiting like a good hunter would, like somebody who knows how to stalk his prey, like somebody who is patient, like somebody who pulls the trigger at the right time, what's Ray [Troxell] doing? He's setting up his defense at the Home Depot between 6:55 and 7:26 p.m.

(ECF 24 at 19).[3]   As noted previously, the trial judge instructed the jury that the prosecutor's arguments during summation were not evidence. This instruction, coupled with the evidence implicating Petitioner in the crime, most specifically Kissel's testimony whereby he testified that Petitioner confessed, along with other circumstantial evidence, such as Chicarella's testimony regarding the similarity of the pills he received from Petitioner compared to those found by Russo, the cell phone evidence previously described, the dispatcher's inability to account for Petitioner's

---

[3] As noted *supra* Part II, the prosecutor's theory was that Russo was murdered around 7:00 p.m. on December 15, 2008.

whereabouts at the time of the murder and Petitioner's testimony regarding owning an American Derringer but his inability to account for its whereabout as previously described leads this Court to conclude that the statements by the prosecutor during summation about Petitioner "stalking his prey" did not have a substantial or injurious effect on the jury's verdict to warrant federal habeas relief even assuming the prosecutor's statements were improper.

Within this claim, Petitioner also argues that the prosecutor committed misconduct by parading Petitioner's guns in front of the jury.  It is worth noting at the outset that Petitioner's guns were admitted into evidence.  Indeed, this issue was specifically contested during Petitioner's direct appeal as he argued the trial court erred when it permitted Petitioner's guns found in his Pennsylvania home be admitted into evidence.  In analyzing the actual evidentiary issue of the admissibility of the guns, the New Jersey Superior Court, Appellate Division noted as follows:

> [T]he court emphasized the limited purposes for which the guns were introduced at trial, thus highlighting the relevancy of such evidence.  Specifically, the court admitted the firearms recovered from defendant's [Marsh's] home in order to (1) show defendant's [Marsh's] general familiarity with firearms and (2) support the State's argument that the missing Derringer allegedly used to shoot Russo was not found among the firearms recovered from defendant's [Marsh's] Pennsylvania residence.

> Addressing defendant's [Marsh's] contentions on appeal, his familiarity with firearms was directly relevant to the case, as Russo was killed at point blank range by a single gunshot to [the] head.  As the State argued below, defendant's [Marsh's] familiarity with firearms allowed for the reasonable inference that Troxell would want to hire defendant [Marsh] "over anybody else that the defense may argue is the real killer."

> Further, evidence regarding the missing Derringer was highly relevant to the charged crime, since it was the State's contention, bolstered by the dispatcher and expert testimony, that a Derringer was likely the murder weapon.  Introducing the gun collection to show that the suspected murder weapon was missing therefrom was relevant, and its probative value was not substantially outweighed by any prejudice to defendant [Marsh].  *N.J.R.E.* 403.

Most importantly, the judge provided the jury with a limiting instruction, which eliminated any possible prejudice to defendant [Marsh].   The court reminded the jury of the limited purpose for which the weapons recovered from defendant's [Marsh's] residence were admitted into evidence:

> Now, in this case evidence has been introduced that recovered from defendant's [Marsh's] residence were a number of firearms, long rifles as well as handguns and bullets. This was admitted for the limited purpose of showing [defendant's] familiarity with firearms and also that the State alleges that an American Derringer was not found among the firearms that were recovered from the residence. Okay?

> You may not, may not use this evidence to conclude that [defendant] [Marsh] has a tendency to commit crimes or that just because he owns weapons, both long rifles and handguns, he must be guilty or, for that matter, is more likely to be guilty of the murder of Mr. Vincent Russo. Similarly, the issue of hunting may not be used, may not be used to infer that he's more likely to commit this offense.

> The defendant's [Marsh's] hunting, the possession of weapons in Pennsylvania is and was a lawful activity. To the extent that he may have special skill or training specific to hunting, that may be considered by you.

> His military service . . .  to this country also does not raise any inference that he's more likely to commit a crime or that he's a violent person or a bad person. There is no connection with the shooting of a Derringer and the military. You may consider that evidence to the extent it impacts on knowledge of weapons, if you believe it does, and inferences from that. But there is no connection between military service and likelihood to commit offenses or being a bad person.

> This evidence, all this evidence has been admitted for those very limited purposes and should not be considered for any other purpose.

The lack of prejudicial impact is further illustrated by defendant's [Marsh's] failure to object to the proposed instruction either at the charge conference or during the charge itself. *See State v. R .B.,* 183 *N.J.* 308. Accordingly, we reject defendant's [Marsh's] assertion of plain error.

In considering the validity of a jury charge, plain error is "legal impropriety in the charge prejudicially affecting the substantial rights of the defendant sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result." *State v. Hock,* 54 *N.J.* 526, 538 (1969), *cert. denied,* 399 *U.S.* 930, 90 *S. Ct.* 2254, 26 *L. Ed.* 2d 797 (1970). Additionally, "[e]rrors impacting directly upon [ ] sensitive areas of a criminal trial are poor candidates for rehabilitation" under the plain error doctrine. *State v. Simon,* 79 *N.J.* 191, 206 (1979).

Contrary to defendant's [Marsh's] contention, this limiting instruction was sufficient to overcome any prejudice the State may have created in repeatedly referencing defendant's [Marsh's] gun collection and marksmanship. Reading the charge as a whole, *State v. Wilbely,* 63 *N.J.* 420, 422 (1973), the instruction reinforces the court's prior statement to the jury that "[h]unting has nothing to do with this trial." While the court permitted the jury to consider defendant's [Marsh's] special hunting skills as evidence of his familiarity with weapons, the charge directly cautions against the use of such evidence to prove defendant's [Marsh's] propensity to commit the crime. Moreover, we "presume that the jury followed the instruction accurately." *State v. Winder,* 200 *N.J.* 231, 256 (2009).

*Marsh*, 2014 WL 5285636, at *15–16.

The issue of the admissibility of the guns was a significantly contested issue during pretrial proceedings. Ultimately, the trial judge permitted their admission, but noted that a limiting instruction would be given to the jury. That was then expressly done in this case by the trial judge. (*See* ECF 16 at 12).

Prior to analyzing this claim, it is important to reiterate the standard of review for this claim that was raised, analyzed, and denied by the state courts. For Petitioner to potentially receive relief

under the "contrary to" clause of 28 U.S.C. § 2254(d)(1), Petitioner needs to show that the state court applied a rule different from the governing law of the United States Supreme Court, or if it decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *See Bell v. Cone*, 535 U.S. 685, 694 (2002) (citing *Williams*, 529 U.S. at 405-06).  Petitioner has done neither in this case.

Petitioner may receive habeas relief under the "unreasonable application" clause of § 2254(d)(1) if the state court identifies the governing legal principles from United States Supreme Court caselaw, but unreasonably applies it to the facts of this case.  *See id.* (citing *Williams*, 529 U.S. at 407-08).  The United States Supreme Court though has stressed that the "unreasonable application" inquiry is different than an incorrect one, such that a federal habeas court cannot issue writ of habeas corpus "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *See Williams*, 529 U.S. at 411.

Applying the above standards, this Court finds Petitioner is not entitled to relief on this claim.  While this Court believes the prosecutor's actions and antics related to parading guns to the jury amounted to possible error, this Court, given the high AEDPA standard, finds that the state court's denial of this claim was neither contrary to, nor an unreasonable application of clearly established United States Supreme Court precedent.  Indeed, the Appellate Division relied on the judge's curative instructions and the quantum of evidence produced at trial, which has been described *supra*.  While this Court's independent analysis may have come to a different conclusion, this Court does not find that the state court's denial of this claim on prejudicial/harmlessness grounds was contrary to clearly established federal law as it properly outlined the relevant prosecutorial misconduct elements, nor was it an unreasonable application of

clearly established federal law.  Accordingly, Petitioner is not entitled to federal habeas relief on this prosecutorial misconduct claim.

    B.  <u>Claim I – Ineffective Assistance of Counsel</u>

In Claim I, Plaintiff raises numerous ineffective assistance of counsel claims.  Each are considered in turn.

    1.  *Failure to Object During Opening and Closing Statements*

In Petitioner's first ineffective assistance of counsel claim, he alleges that trial counsel was ineffective for his failure to raise objections during the prosecutor's opening and closing statements.  This Court presumes this claim refers to the prosecutor's opening and closing statements as Petitioner raised within Claim II where Petitioner's trial counsel chose not to expressly object to the following:

1.  Claim II(b) – prosecutor committing misconduct by stating that the victim would say "Marsh killed him" during opening statement;

2.  Claim II(h) – prosecutor's statement during closing argument that Petitioner was lying in wait and also prosecutor's actions parading guns before the jury.

The Sixth Amendment guarantees effective assistance of counsel. In *Strickland v. Washington,* 466 U.S. 668 (1984), the Supreme Court articulated the two-prong test for demonstrating when counsel is deemed ineffective.  First, a petitioner must show that considering all the circumstances, counsel's performance fell below an objective standard of reasonableness. *See id.* at 688; *see also Grant v. Lockett*, 709 F.3d 224, 232 (3d Cir. 2013) (noting that it is necessary to analyze an ineffectiveness claim considering all circumstances) (citation omitted).  A petitioner must identify the acts or omissions that are alleged not to have been the result of reasonable professional judgment. *See Strickland*, 466 U.S. at 690.  Under this first prong of the

37

*Strickland* test, scrutiny of counsel's conduct must be "highly deferential." *See id.* at 689.  Indeed, "[c]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690.  The reviewing court must make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689.  If counsel makes "a thorough investigation of law and facts" about his plausible options, the strategic choices he makes accordingly are "virtually unchallengeable." *Gov't of Virgin Islands v. Weatherwax*, 77 F.3d 1425, 1432 (3d Cir. 2006) (citing *Strickland*, 466 U.S. at 690-91).  If, on the other hand, counsel pursues a certain strategy after a less than complete investigation, his choices are considered reasonable "to the extent that reasonable professional judgments support the limitations on investigation." *Rolan v. Vaughn*, 445 F.3d 671, 682 (3d Cir. 2006) (citing *Strickland*, 466 U.S. at 690-91).

The second prong of the *Strickland* test requires a petitioner to affirmatively prove prejudice. *See* 466 U.S at 693.  Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.  A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.*; *see also McBride v. Superintendent, SCI Houtzdale*, 687 F.3d 92, 102 n.11 (3d Cir. 2012).  "This does not require that counsel's actions more likely than not altered the outcome, but the difference between *Strickland's* prejudice standard and a more-probable-than-not standard is slight and matters only in the rarest case.  The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 111-12 (2011) (internal quotation marks and citations omitted).

"With respect to the sequence of the two prongs, the *Strickland* Court held that 'a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.... If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice [...] that course should be followed.'" *Rainey v. Varner*, 603 F.3d 189, 201 (3d Cir. 2010) (quoting *Strickland*, 466 U.S. at 697).

This Court has already extensively reviewed the prosecutor's remarks in his opening and closing statements. As this Court has already extensively recounted, the trial court instructed the jury that the prosecutor's remarks during opening and closing arguments were not evidence. The jury is presumed to have followed those instructions. *See Weeks*, 528 U.S. at 234. Thus, any prejudice that may have resulted from the prosecutor's statements were likely rectified by the trial judge's curative instructions. Furthermore, the evidence produced at Petitioner's trial implicated Petitioner as discussed *supra*. This included Kissel's testimony regarding Petitioner's confession. Given these circumstances, this Court fails to find that Petitioner has adequately shown that the outcome of his trial would have been different to a reasonable probability had his counsel objected to the issues described above during the prosecutor's opening and closing statements. Thus, Petitioner has failed to show that he was prejudiced under *Strickland*. Accordingly, this claim is denied.[4]

## 2.  *Failure to Object to Prosecutor Impugning Bonnie Reed Kasperski*

In Petitioner's next ineffective assistance of counsel of claim, Petitioner claims that the prosecutor impugned Petitioner's alibi witness, Bonnie Reed Kasperski. Petitioner raised this

---

[4] To the extent that Petitioner raises individual arguments regarding counsel's failure to object within Claim I regarding the prosecutor's statements during opening and/or closing statements, they are analyzed *infra*.

claim in his PCR proceedings.  The New Jersey Superior Court, Law Division first properly stated

the applicable *Strickland* standard as follows:

> Under the first prong of the Strickland test, a defendant must show
> that defense counsel's performance was deficient.  Strickland, 466
> U.S. at 687.  With respect to deficient performance, the test is
> "whether counsel's conduct fell below an objective standard of
> reasonableness."  Strickland, 466 U.S. at 687-88.  This requires a
> showing that counsel committed serious errors and, as a result, failed
> to function as the advocate guaranteed to the defendant by the Sixth
> Amendment.  Id. at 687.  Adequate assistance of an attorney is
> measured according to whether counsel has professional skills
> comparable to other practitioners in the field, which has been
> equated with a standard of "reasonable competence." Fritz, 105 N.J.
> at 53.  As explained by the New Jersey Supreme Court in State v.
> Davis, 116 N.J. 341, 351 (1989), "reasonable competence" does not
> mandate "the best attorneys, but certainly not one so ineffective as
> to make the idea of a fair trial meaningless."  Under Strickland, the
> defendant must overcome "the strong presumption" that counsel's
> conduct, "falls within the wide range of reasonable professional
> assistance."  Strickland, 466 U.S. at 668.
>
> Under the second prong of the Strickland test, defendant must
> demonstrate a "reasonable probability that, but for counsel's
> unprofessional errors, the result of the proceeding would have been
> different."  Id. at 694.  The Strickland Court noted that "a reasonable
> probability" is "a probability sufficient to undermine confidence in
> the outcome."  Id.  Hence, counsel's errors must be "so serious as to
> deprive the defendant of a fair trial."  Id.
>
> Simply put, a defendant's right to effective assistance of counsel is
> satisfied when the defendant has had the benefit of the advice and
> guidance of a reputable and competent attorney."  State v. Bentley,
> 46 N.J. Super. 193, 203 (App. Div. 1957).  Dissatisfaction with an
> unfavorable outcome, coupled with mere allegations that trial
> counsel was inefficient will not sustain a petition for Post-
> Conviction Relief, nor invalidate a trial.  Id.  Further, the court shall
> not grant an evidentiary hearing when the Petitioner's allegations
> are too vague, conclusory, or speculative.  R. 3:22-10(e)(2).  A
> reviewing court must indulge a strong presumption that counsel's
> conduct falls within the wide range of reasonable professional
> assistance.  Strickland, 466 U.S. at 669. . . .

Petitioner also argues that trial counsel failed to timely object to the

prosecutor's misconduct.  The Court cannot find that Petitioner has

established that trial counsel was deficient in this case. As to the first prong of Strickland, whether or not trial counsel's performance was outside the standard of reasonable professional assistance, Petitioner has failed to establish that trial counsel's performance was deficient. . . .

As to Petitioner's assertion that trial counsel failed to properly object, the Court notes that trial counsel conducted a vigorous defense on Petitioner's behalf and objected frequently to the Assistant Prosecutor's questions and comments during summation. As a result, the trial court sustained many objections and issued numerous curative instructions. Trial counsel's performance was well within the reasonable standard of professional assistance.

As to the second prong of Strickland, whether or not trial counsel's alleged deficiencies resulted in prejudice to Petitioner, Petitioner's argument that the trial would have turned out differently had trial counsel cured the cited deficiencies is undermined by the Appellate Division decision in this case. The Appellate Division held that Petitioner had received a fair trial and despite the "lapses in judgment" of the Assistant Prosecutor, that the jury had sufficient evidence on which to find Petitioner guilty. Therefore, Petitioner has failed to establish either prong of the Strickland standard and thus has not established that trial counsel was ineffective.

(ECF 19 at 44-46).

On appeal, the Appellate Division found that all of Petitioner's ineffective assistance of counsel claims failed because Petitioner failed to show prejudice. *See Marsh*, 2018 WL 1954802, at *4.

This Court finds that Petitioner is not entitled to federal habeas relief on this ineffective assistance of counsel claim. Indeed, the state courts properly recited and applied the *Strickland* standard to this claim. Petitioner asserts that the prosecutor purportedly altered the burden of proof by implying during his opening statement what Petitioner's proposed alibi witness would testify to. However, as discussed *supra*, given the weight of the evidence against Petitioner as well as the trial judge's instructions regarding how the prosecutor's statements should not be considered evidence, this Court finds that Petitioner has failed to show that had counsel objected, the result of

the proceeding would have been different to a reasonable probability.  Thus, Petitioner has failed to show that the state court's decision was contrary to, or an unreasonable application of *Strickland's* prejudice prong.  Accordingly, this claim is denied.

### 3.  *Failure to Seek a Limiting Instruction Regarding Financial Motive*

Next, Petitioner argues counsel was ineffective in failing to request a limiting instruction when the prosecutor raised the issue of Petitioner's purported financial motivation to murder Russo.  During Petitioner's trial, Petitioner's landlord, Todd Farber, testified that Petitioner owed him $3,000 in unpaid rent.  (*See* ECF 13 at 17-18).  Then, during Petitioner's counsel's closing argument, he stated to the jury as follows:

> The first big break, the big break of the case comes from who?  Comes from who?  J.C. Kissel.  The State's star witness.  Star witness.
>
> Remember his testimony.  Remember what he told you.  Pay attention to his version of the events.  His testimony should not have begun with the oath.  It should have begun with once upon a time because it's a fairytale.  It's things he's making up to cover himself.  Because I would suggest the evidence would show you, ladies and gentlemen, I don't know whether or not he's the killer, maybe not, but he knows who the killer is.  He's not giving the killer up.  He's afraid of whoever did this.  But he's not afraid of Frank Marsh.  Frank Marsh is his patsy, his cab driver, his best friend.  Please.
>
> Who looks like they're in more desperate financial need?  Frank, who's got a loving family, who has worked as a printer for 17 years, who is a hard working guy, who comes and works as a cab driver, who is squirreling money away to Christmas shop, who lives in a place, who's got assets, who has a car?  Does he look like he's in financial dire straits or is it Kissel, who is on the balls of his you know what sitting at home in the dark without any cable T.V. slamming down Morgan – Captain Morgan and Cokes at the bar?  Who seems to be more in desperate financial need?

(*See* ECF 15-2 at 17).

Where defense counsel invites an attack during closing arguments, the defendant's due process right to a fair trial is not denied when the prosecutor does nothing more than respond to the attack. *See Nelson v. Brazelton*, No. 12-7425, 2014 WL 3536527, at *17 (C.D. Cal. Jan. 30, 2014) (citing *Lawn v. United States*, 355 U.S. 339, 359 n.15 (1958)), *report and recommendation adopted*, 2014 WL 3536538 (C.D. Cal. July 16, 2014).  Thus, where a prosecutor's remarks are invited, and the prosecutor's remarks do no more than to right the scale, such comments do not warrant reversing a conviction.  *See Nelson*, 2014 WL 3536527, at *17 (citing *United States v. Young*, 470 U.S. 1, 12-13 (1985)).

Subsequently, prior to the prosecutor's closing arguments, the following colloquy took place between the prosecutor, Petitioner's trial counsel and the trial judge:

> [PROSECUTOR]: There was also another point in the summation when the defendant – Mr. Fetky [Marsh's trial counsel], quite frankly, asked who is in more dire financial need in this case, making a comparison between J.C. Kissel and Frank Marsh.  I'm not able to discuss the defendant's lack of funds, the pecuniary interest.  That the Court has said I'm not entitled to go into.  But I think it's not fair comment for him to open that door, ask that question knowing that I can't respond to it.
> [TRIAL JUDGE]: Stop there.  Go ahead.  How do you respond to that?
> [MARSH'S TRIAL COUNSEL]: Judge, I don't think I opened any door.  I believe I commented on the evidence and the state's theory that my client did this for no other reason, Judge, no other reason other than $3,000.
> [TRIAL JUDGE]: So you agree that, in fact, the State can say that this is a financially motivated crime and you may consider the need that this defendant may have had?
> [MARSH'S TRIAL COUNSEL]: I mean, I hung it out there.  Judge.  I don't see – I think it's a fair comment.
> [TRIAL JUDGE]: Counsel, you may in fact, address it, but I tell you walk very gingerly.  Don't overdo it.  Keep your comments limited to one or two sentences as Mr. Fetky [Marsh's trial counsel] did.  And I think that would balance it out. . . . I think you [Marsh's trial counsel] opened the door, quite frankly, when you started talking about pecuniary interest.  And it's always been the State's position that this was done out of the motive to get money.  Just do not infer

> that somebody who needs money is more likely to commit an offense. It's the issue of people who don't have money being more likely to commit crimes that is verboten, if you will. That cannot be mentioned and is an unfair inference. If you keep it to a sentence, as Mr. Fetky [Marsh's trial counsel] did, quite frankly, in his summation, I think it's fair comment.

(*See* ECF 15-2 at 45-47).

During the prosecutor's summation, he referred to Petitioner owing Traber $3,000 as was testified to during the trial. Furthermore, as to whether Kissel had a pecuniary interest in killing Russo, the prosecutor stated as follows:

> But J.C. [Kissel], on the money issue, was certainly running a business. He would take half the proceeds. He would work for Artie Lang. . . . J.C. had other sources of income. He certainly had no financial incentive to do this. I don't know where this, you know, stuff about electricity and the like. We can all miss a payment on our electric bill and our cable bill. But he was running a business. And you've already heard about the defendant, where he lived, what he was doing. Again, evidence that is more than just a coincidence.

(*See* ECF 34 at 26-27).

Petitioner fails to show that counsel's performance fell below an objective standard of reasonableness by not asking for a limiting instruction regarding the prosecutor's statements about Petitioner's possible pecuniary interest. Indeed, Petitioner's counsel opened the door to the issue during his summation, such that the prosecutor was clearly permitted to respond. The prosecutor's summation on the issue of Kissel's versus Petitioner's pecuniary interest was limited to only a few sentences of a lengthy summation, and as noted *supra*, the jury was instructed that the attorney's arguments are not evidence for their consideration during deliberations. This Court fails to see how Petitioner's counsel's failure to ask for a limiting instruction was objectively unreasonable under the first prong of *Strickland* given he was the one who had opened the door to this argument.

However, within this claim, Petitioner also appears to assert that his trial counsel was ineffective because he "invited the error." In New Jersey, a prosecutor should not elicit testimony of a defendant's general poverty to tie a defendant into a criminal milieu. *See Mathis*, 221 A.2d at 538. That is not what occurred in this case. Instead, the government elicited the testimony from Farber to show that Petitioner owed a specific debt of $3,000, coincidentally, or not, the precise amount that Troxell paid Petitioner to carry out the murder of Russo. This was not a case where the prosecutor espoused Petitioner's general poverty as the reason for the Russo murder. The prosecutor's actions did not run afoul of *Mathis* and its progeny. To the extent that Petitioner's trial counsel opened the door to allow the prosecutor to expound on this point did not run afoul of *Strickland*. Indeed, the trial court's instructions explaining to the jury that the prosecutor's statements were not evidence help support a finding of no prejudice in this case. This claim is denied.

4.   *Implicating Petitioner in Arrest from Sergeant Miller's Testimony*

In Petitioner's next ineffective assistance of counsel claim, he argues that trial counsel was ineffective when he failed to object and/or request a limiting charge/instruction regarding Sergeant Miller's questioning of co-defendant Troxell, which unfairly implicated Petitioner.

In *supra* Part IV.A.4, this Court determined that any possible Confrontation Clause violation that was caused by the prosecutor's questioning was harmless. Because Petitioner's Confrontation Clause issue associated with the prosecutor's questioning of Sergeant Miller regarding his interview with co-defendant Troxell was harmless, he also cannot make a showing that he suffered prejudiced under *Strickland* due to his trial counsel's inaction. *See Kelly v. McKee*, No. 16-1572, 2017 WL 2831019 at *8 (6th Cir. Jan. 24, 2017) ("Because Kelly suffered harmless error [under *Brecht*] at best, he cannot establish that he suffered prejudice [under *Strickland*].");

*Oilvares v. Soto*, 588 F. App'x 555, 555 (9th Cir. 2014) ("[F]or the same reasons his Confrontation Clause claim fails under the harmless error standard, Olivares cannot show that he was prejudiced by his trial counsel's failure to object to the admission of his codefendant's statements). Thus, for these reasons, this ineffective assistance of counsel claim is also denied.

          5.   *Presentation of Guns in the Courtroom*

       Petitioner's final ineffective assistance of counsel claim is that trial counsel should have objected to the prosecutor's presentation at trial of his firearms that were found on his property in Pennsylvania.

       In *supra* Part IV.A.8, this Court determined that the state court's determination that any purported error by the prosecutor in displaying Petitioner's firearms during the trial was not contrary to, or an unreasonable application of clearly established law as related to the harmless error standard for a misconduct claim. As this Court noted in the previous section, that harmless error analysis applies equally to Petitioner's claim under *Strickland* to establish a lack of prejudice. Accordingly, this claim is denied as well.

      C.  <u>Claim Three - Cumulative Error</u>

       In Claim Three, Petitioner asserts a habeas claim arguing that due to the cumulative errors of the prosecutor and his trial counsel, he is entitled to relief. Errors that do not individually warrant federal habeas relief may sometimes do so when combined. *See Albrecht v. Horn*, 485 F.3d 103, 139 (3d Cir. 2007) (footnote omitted) (citing *Marshall v. Hendricks*, 307 F.3d 36, 94 (3d Cir. 2002)).

       This Court has noted certain instances where the prosecutor may have erred such as:

1.  Stating that Russo would have said "Marsh killed him";

2. Implying superior knowledge by allowing Sergeant Miller to testify that Petitioner was arrested after he took co-defendant Troxell's statement;

3. Asking questions of Petitioner's gun ownership; and

4. Stating that Petitioner was lying in wait and parading guns in the courtroom.

However, such errors were deemed to be harmless. Similarly, trial counsel might have objected to certain portions of the prosecutor's opening and closing statements, but this Court found that the state court's decision was not contrary to or an unreasonable application of clearly established law on these claims. More specifically, there was no prejudice under *Strickland* when the prosecutor stated that Russo would have said "Marsh killed him," as well as for the prosecutor's statements and actions in his summation regarding Petitioner's guns and impugning Kasperksi.

The last reasoned decision on Petitioner's cumulative error claim on his prosecutorial misconduct claims was on his direct appeal. The Appellate Division held as follows:

> We turn to defendant's final claim that a mistrial is warranted due to the cumulative effect of the prosecutor's conduct. While one instance of misconduct may not warrant reversal, the cumulative effect of multiple instances may create the requisite prejudice to require reversal. *State v. Rodriguez,* 365 *N.J. Super.* 38, 52–53 (App.Div.2003), *certif. denied,* 180 *N.J.* 150 (2004). "We are cognizant that criminal trials create a 'charged atmosphere that frequently makes it arduous for the prosecuting attorney to stay within the orbit of strict propriety." *State v. Rose,* 112 *N.J.* 454, 516 (1988) (quoting *State v. Bucanis,* 26 *N.J.* 45, 56, *cert. denied,* 357 *U.S.* 910, 78 *S.Ct.* 1157, 2 *L. Ed.*2d 1160 (1958). As a reviewing court, we should examine (1) whether defense counsel made a timely and proper objection; (2) whether the prosecutor's comment was withdrawn and when; and (3) whether the court provided a curative jury instruction. *State v. Zola,* 112 *N.J.* 384, 426 (1988), *cert. denied sub nom, Zola v. New Jersey,* 489 *U.S.* 1022, 109 *S.Ct.* 1146, 103 *L. Ed.*2d 205 (1989).
>
> We have carefully examined the record concerning the alleged improprieties by the prosecutor. While we do not condone those comments made by the prosecutor, which were inappropriate, we are convinced that defendant was not deprived of a fair trial.

> This was a lengthy trial spanning sixteen days. In that regard, the prosecutor's conduct must be viewed in the context of a protracted trial. *Engel, supra,* 249 *N.J. Super.* at 382. Therefore, viewing the trial as a whole, we are satisfied the trial judge appropriately and promptly addressed what the record shows were lapses in judgment by the prosecutor. The judge's general and curative instructions appropriately provided the jury with the guidance it needed to reach a fair and sustainable verdict based on the evidence presented at trial, and "obviated any lingering potential for prejudice." *Ibid.*

*Marsh*, 2014 WL 5285636, at *13–14. As previously noted, the harmless error standard that is applied to prosecutorial misconduct claims is similar to *Strickland's* prejudice standard. *See Oilvares*, 588 F. App'x at 555.

This Court, like the Appellate Division, does not condone the comments made by the prosecutor, which were inappropriate. Nevertheless, this Court is also mindful that it reviews this claim applying AEDPA deference. The state court noted the curative instructions and evidence at Petitioner's trial. Courts are far less likely to find cumulative error where errors are followed by curative instructions or when a record contains overwhelming evidence of a defendant's guilt. *See United States v. Thornton*, 1 F.3d 149, 157 (3d Cir. 1993). Here, the trial judge gave numerous curative instructions to the jury throughout the trial. Those instructions, coupled with the quantum of evidence against Petitioner such as his confession to Kissel and the other circumstantial evidence described in this Opinion and by the Appellate Division on Petitioner's direct appeal, lead this Court to conclude that Petitioner's cumulative error claim will be denied as any such error did not deprive Petitioner of a fair trial.

## V.      CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254. A certificate of appealability may issue "only if the applicant has made a substantial

showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).

This Court finds that the prosecutor may have erred in several respects at trial. However, applying AEDPA deference, this Court finds that the state court's denial of those claims was not contrary to, nor an unreasonable application of clearly established federal law. Nevertheless, given the "lapses in judgment" by the prosecutor, certain claims deserve encouragement to proceed further. Thus, a certificate of appealability shall issue on the following claims:

1. Claim I(e) – Trial counsel's failure to object to the presentation of guns in the courtroom;

2. Claim II(g) – Prosecutorial misconduct by continuing to ask Petitioner questions about gun ownership;

3. Claim II(h) – Prosecutorial misconduct when prosecutor stated Petitioner had laid in wait to murder Russo and when the prosecutor paraded guns before the jury; and

4. Claim III – Cumulative error.

A certificate of appealability shall not issue on Petitioner's remaining claims as they do not meet the standard set forth in *Miller-El*. An appropriate Order will be entered.

## VI.    CONCLUSION

For the foregoing reasons, the habeas petition is denied.  A certificate of appealability shall issue on certain claims outlined in this Opinion but not on others. An appropriate order will be entered.


DATED:  November 22, 2023                          *s/Georgette Castner*
                                                    **GEORGETTE CASTNER**
                                                    **United States District Judge**